Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL X

| | | |
|---|---|---|
| FERNANDO MÁRQUEZ, DORA E. GARCÍA Y JOSEFINA O. CAPOTE; CARMEN DELIA MIRANDA VDA. DE FERRER; EDWIN DÍAZ; RAFAEL RODRÍGUEZ POR SÍ Y EN REPRESENTACIÓN DE LA CLASE CON UNA ESTACIÓN PRINCIPAL RESIDENCIAL (CLASE A);<br><br>HEALTH CARE PARTNERS, INC.; RAÚL DELGUY CAPILLA; SANTA PAULA OIL CORP.; BEST GAS; HOWARD FERRER; B/JCS DELI BOX; EDWIN DÍAZ; INSURAMERICA AGENCY; INTERSERVICE GROUP; INTERAMERICAN BUSINESS CONSULTANT; INSTITUTO NEUMOLÓGICO POR SÍ Y EN REPRESENTACIÓN DE LA CLASE CON UNA ESTACIÓN PRINCIPAL NEGOCIOS (CLASE B);<br><br>INTERSERVICE GROUP, INC.; INTERAMERICAN BUSINESS CONSULTANT; INSTITUTO NEUMOLÓGICO POR SÍ Y EN REPRESENTACIÓN DE LA CLASE CON UNA LÍNEA PRINCIPAL DE NEGOCIOS (CLASE C)<br><br>*Apelados*<br><br>v.<br><br>PUERTO RICO TELEPHONE COMPANY<br><br>*Apelante* | KLAN202400066 | Apelación procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso Núm.: D CD2017-1047 (502)<br><br>Sobre: Reclamación bajo la Ley de Telecomunicaciones de Puerto Rico, Núm. 213 de 12 de septiembre de 1996, 27 LPRA sec. 265 y la Ley de Acción de Clase por Consumidores de Bienes y Servicios, según enmendada, 32 LPRA sec. 3341 |

Panel integrado por su presidenta, la Juez Lebrón Nieves, la Juez Barresi Ramos y la Jueza Santiago Calderón

Santiago Calderón, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de abril de 2024.

Comparece ante nos, Puerto Rico Telephone Company (PRTC o parte apelante), mediante recurso de *Apelación* presentado el 19

de enero de 2024. En su recurso, solicita que revoquemos la *Sentencia Parcial* emitida el 20 de diciembre de 2023, notificada el 22 de diciembre de 2023, por el Tribunal de Primera Instancia, Sala Superior de Bayamón (TPI).

Mediante el referido dictamen, el TPI declaró *Ha Lugar* la *Demanda* incoada por Fernando Márquez, Dora E. García, Josefina O. Capote, Howard Ferrer, Edwin Díaz, Rafael Rodríguez, por sí y en representación de la Clase con Una Estación Principal Residencial (Clase A); Health Care Partners, Inc., Raúl Delguy Capilla, Santa Paula Oil Corp., Best Gas, Howard Ferrer; B/JCS Deli Box, Edwin Díaz, Insuramerica Agency, Interservice Group, Interamerican Business Consultant, Instituto Neumológico, por sí y en representación de la Clase con Una Estación Principal de Negocios (Clase B); e Interservice Group, Inc., Interamerican Business Consultant e Instituto Neumológico, por sí y en representación de la Clase con Una Línea Principal de Negocios (Clase C), (en conjunto, parte apelada).

Por los fundamentos que exponemos a continuación, **revocamos** la *Sentencia Parcial* apelada.

**I.**

Según surge del legajo apelativo, el 17 de noviembre de 2003, la parte apelada presentó una *Demanda de Clase*[1] contra la PRTC. En su reclamación, alegó que la PRTC durante siete (7) años cobró un cargo mensual por el servicio de tele-tecla que no estuvo basado en el costo de proveer dicho servicio. Por tanto, adujo que el cobro de dicho cargo violó la Ley Núm. 213 de 12 de septiembre de 1996, conocida como la Ley de Telecomunicaciones de Puerto Rico, (Ley Núm. 213-1996), y, por ende, reclamaron el reembolso de $105,350,000.00, más costas, intereses y honorarios de abogado.

---

[1] Apéndice del Recurso de Apelación, págs. 1-15.

En ese entonces, el TPI ordenó que se bifurcara el descubrimiento de prueba, y se iniciara lo relacionado con la procedencia o no de la certificación de clase[2]. Luego de varios trámites procesales, el 3 de mayo de 2005, el TPI emitió *Resolución* mediante la cual declaró *Ha Lugar* la certificación de las tres (3) clases demandantes.

Así las cosas, el 4 de noviembre de 2005, la Asamblea Legislativa aprobó la Ley Núm. 138-2005, la cual enmendó la Ley Núm. 213-1996. Entre las enmiendas aprobadas, la Ley Núm. 138-2005, le confirió jurisdicción primaria y exclusiva a la Junta Reglamentadora de Telecomunicaciones (JRT) sobre los pleitos de clase relacionados con asuntos de telecomunicaciones. En consecuencia, y previa solicitud de la PRTC, el 5 de mayo de 2006, el TPI refirió el caso a la JRT, por ser el foro con jurisdicción primaria y exclusiva para dilucidar cualquier pleito en el que se aleguen violaciones a la Ley de Telecomunicaciones.

Así pues, y pendiente el caso ante la JRT, el 14 de agosto de 2013, la Asamblea Legislativa aprobó la Ley Núm. 118-2013. En esta ocasión, el cuerpo legislativo enmendó nuevamente la Ley Núm. 213-1996 y eliminó la jurisdicción primaria y exclusiva de la JRT en los pleitos de clase relacionados a violaciones a las disposiciones de la Ley de Telecomunicaciones de Puerto Rico y a los reglamentos de la JRT.

En vista de lo anterior, el 17 de diciembre de 2013, notificada el 11 de abril de 2014, la JRT emitió *Resolución y Orden*[3]. Mediante dicho dictamen, la JRT ordenó el traslado de este caso al TPI y precisó lo siguiente:

[…]

En el presente caso la Junta no ha hecho adjudicaciones de carácter sustantivo y con la transferencia de éste, según lo dispone la Ley 118, no se menoscaban las

---

[2] Apéndice del Recurso de Apelación, pág. 1072.
[3] Apéndice del Recurso de Apelación, págs. 795-797.

relaciones contractuales o derechos sustantivos de ninguna de las partes.[4]

Luego de varios incidentes procesales que fueron atendidos por un panel hermano en el caso KLCE201601040, el caso de autos quedó bajo la jurisdicción del TPI de Bayamón.

Así las cosas, referente a la controversia argüida en el recurso de *Apelación* que nos ocupa y relacionada con el descubrimiento de prueba, admisiones y utilización del informe pericial de la parte apelada, surge del expediente que, el 21 de julio de 2017, el TPI celebró conferencia sobre el estado de los procedimientos[5]. En dicha conferencia, la parte apelante **argumentó sobre la necesidad y continuidad del descubrimiento de prueba**, para así proceder a contestar adecuadamente una *Moción de Sentencia Sumaria* previamente presentada por la parte apelada[6]. Ese mismo día, el **TPI determinó que las partes debían contestar el descubrimiento de prueba para el 8 de septiembre de 2017**, se les requirió la preparación de un informe de manejo de caso y se señaló vista para el 8 de diciembre de 2017[7].

El 7 de diciembre de 2017, notificada el 20 de diciembre de 2017, el TPI emitió una *Orden*, en la que informó la suspensión de la vista pautada para el 8 de diciembre de 2017[8].

El 13 de diciembre de 2017, se presentó el *Informe Conjunto para el Manejo del Caso*[9], **en el cual las partes informaron como peritos el señor Don J. Wood (perito Wood), por la parte apelada, y el señor Dave Blessing (perito Blessing), por la parte apelante**[10].

---

[4] Apéndice del Recurso de Apelación, pág. 796.
[5] Apéndice del Recurso de Apelación, págs. 1070-1080.
[6] Apéndice del Recurso de Apelación, pág. 1075.
[7] Apéndice del Recurso de Apelación, págs. 1077-1079.
[8] Apéndice del Recurso de Apelación, págs. 2298-2300.
[9] Apéndice del Recurso de Apelación, págs. 2279.
[10] Apéndice del Recurso de Apelación, págs. 2284-2285.

El 24 de mayo de 2019, el TPI emitió y notificó *Resolución*[11], en la cual declaró *No Ha Lugar* la moción de sentencia sumaria y moción de sentencia sumaria suplementaria presentadas por la PRTC el 1 de noviembre de 2004 y 1 de diciembre de 2017, respectivamente. Además, realizó dos determinaciones de hechos incontrovertidos, a saber:

1. Se incorporan por referencia las determinaciones de hechos de este Tribunal, según constan en la determinación emitida el 3 de mayo de 2005, y notificada el 9 de mayo de 2005, relacionadas con la certificación del pleito de clase. Tales determinaciones han advenido finales y firmes.
2. Los representantes de las clases demandantes no objetaron ni presentaron una querella ante la PRTC con relación a los cargos de tele-tecla que les fueron facturados.

Así, también determinó que los siguientes dos hechos estaban en controversia:

1. Si la PRTC cobró a los demandantes, representantes de las respectivas Clase A, Clase B y Clase C, una tarifa mensual por el servicio de tele-tecla, que no estuvo basada en el costo de proveer tal servicio, en contravención de la Ley Núm. 213-1996.
2. De haber PRTC cobrado dicha tarifa no basada en el costo de proveer el servicio de tele-tecla, a cuánto ascendería el reembolso o compensación correspondiente a la Clase A, Clase B y Clase C.

Para el 29 de mayo de 2019, notificada el 4 de junio de 2019, el TPI emitió *Orden*[12] en la cual solicitó a las partes fechas hábiles para celebrar una conferencia sobre el estado de los procedimientos y, en lo pertinente, expresó que "*[f]inalmente, en la referida vista se considerará cualquier otro asunto pendiente en torno al descubrimiento de prueba*".

El 25 de junio de 2019, notificada el 28 de junio de 2019, el TPI emitió *Orden*[13] y señaló vista de conferencia sobre el estado de los procedimientos para el 28 de agosto de 2019.

El 29 de agosto de 2019, notificada el 3 de septiembre de 2019, el TPI emitió una *Orden* en la que requirió a las partes que

---

[11] Apéndice del Recurso de Apelación, págs. 2798-2813.
[12] Apéndice del Recurso de Apelación, págs. 2814-2815.
[13] Apéndice del Recurso de Apelación, págs. 2845-2847.

informaran tres fechas hábiles para celebrar la vista de conferencia, debido a que la previamente pautada fue pospuesta por el paso de un huracán[14]. El 9 de septiembre de 2019, notificada el 11 de septiembre de 2019, el TPI emitió *Orden* en la que informó que no celebraría la conferencia hasta tanto recibiese el mandato del Tribunal de Apelaciones relacionado con la *Resolución* del 24 de mayo de 2019[15]. El 1 de julio de 2020, el Tribunal de Apelaciones notificó el Mandato[16].

No obstante, el 12 de junio de 2020, la parte apelada presentó *Moción de Sentencia Sumaria*[17]. En su moción, propuso cincuenta y tres (53) hechos que, a su juicio, no se encontraban en controversia. En esencia, alegó que procedía que se dictara sentencia a favor de la clase porque en el proceso anterior ante la JRT, caso JRT-01-Q-0093 entre Teléfonos Públicos de Puerto Rico (TPPR) y la PRTC, ésta última admitió en ese caso, no relacionado al de autos, que el cobro de la tele-tecla era ilegal. Así pues, el perito Wood utilizó la alegada admisión en el caso JRT-01-Q-0093, concluyó en su informe que el cobro de la tele-tecla era ilegal y, por ende, procedió a calcular el cómputo sobre la cantidad a pagar por la PRTC por violación con el ordenamiento jurídico.

Por otro lado, el 31 de julio de 2020, la PRTC presentó su *Oposición a Moción Sentencia Sumaria*[18], la cual acompañó con varios documentos. Particularmente, aseveró que existían hechos en controversia y propuso veintinueve (29) hechos incontrovertidos, veintiséis (26) sostenidos por el informe del perito Blessing. En síntesis, adujo que la *Moción de Sentencia Sumaria* presentada por la parte apelada era prematura porque no había concluido el descubrimiento de prueba previamente solicitado, así como no se

---

[14] Apéndice del Recurso de Apelación, págs. 2853-2855.
[15] Apéndice del Recurso de Apelación, págs. 2882-2883.
[16] Apéndice del Recurso de Apelación, págs. 3094-3095.
[17] Apéndice del Recurso de Apelación, págs. 2888-2927.
[18] Apéndice del Recurso de Apelación, págs. 3106-4077.

había terminado el descubrimiento de prueba pericial, por lo que sostuvo que era inadmisible el informe pericial del perito Wood. También, arguyó que los documentos relacionados con el caso entre TPPR y la PRTC, caso JRT-01-Q-0093, eran inadmisibles porque hubo una transacción en dicho pleito lo cual imposibilita su uso. Por último, argumentó sobre la inaplicabilidad de las doctrinas de impedimento colateral por sentencia, impedimento judicial, cobro de lo indebido y enriquecimiento injusto.

Así las cosas, el 30 de junio de 2023, notificada el 7 de julio de 2023, el TPI emitió una *Orden*[19] en la cual **solicitó que se aclarara la alegación de la parte apelante en cuanto a que la *Moción de Sentencia Sumaria* sometida por la parte apelada era prematura por no haber concluido el descubrimiento de prueba**. Además, el foro primario concedió un término a las partes para que se expresaran sobre el particular.

El 17 de julio de 2023, la parte apelada compareció mediante una *Moción en Cumplimiento de Orden*[20] e informó lo siguiente en su párrafo segundo (2):

> En cumplimiento con lo ordenado por el Tribunal, la parte compareciente no tiene objeción a que se deje en suspenso la Moción de Sentencia Sumaria y se proceda a deponer a los peritos de ambas partes.

Por otro lado, el 1 de agosto de 2023, la PRTC presentó *Moción en Cumplimiento de Orden*[21], en la que expresó que ambas partes solicitaron la continuación del descubrimiento de prueba y desglosó lo adeudado por la parte apelada.

El 3 de agosto de 2023, la parte apelada presentó *Oposición a: Moción en Cumplimiento de Orden*[22]. En apretada síntesis, arguyó que en el presente caso solo restaba el descubrimiento de prueba pericial.

---

[19] Apéndice del Recurso de Apelación, págs. 4261-4264.
[20] Apéndice del Recurso de Apelación, págs. 4265-4266.
[21] Apéndice del Recurso de Apelación, págs. 4267-4268.
[22] Apéndice del Recurso de Apelación, págs. 4269-4271.

Luego de algunos trámites procesales que entendemos innecesarios detallar, el 18 de agosto de 2023, el TPI emitió y notificó una *Orden* en la que señaló vista para el 12 de septiembre de 2023[23].

Así como estaba pautada, se celebró la vista argumentativa[24]. El foro primario citó a las partes, para escuchar sus argumentos referentes al descubrimiento de la prueba pericial y las controversias presentadas en las últimas mociones. Particularmente, la parte apelada vertió para récord que se allanaba a la continuación del descubrimiento de prueba pericial, no obstante, en cuanto a la extensión del descubrimiento en otros parámetros fue debidamente objetado. La parte apelante concurrió con que era necesario el descubrimiento de prueba pericial, pero, además, solicitó al foro primario que la parte apelada respondiera el descubrimiento de prueba remitido previamente.

El TPI, luego de escuchar las argumentaciones de cada parte, ordenó que se realizara el descubrimiento de prueba pericial[25]. Así, se propuso la toma de deposiciones a los peritos para el mes de noviembre de 2023. Referente al cumplimiento del descubrimiento de prueba pendiente, el TPI determinó:

> Honorable Juez: El Tribunal solamente está permitiendo la prueba pericial, descubrimiento de prueba pericial. En cuanto al otro descubrimiento de prueba...
>
> [...]
> Honorable Juez: ... el Tribunal va a emitir una determinación por escrito a la luz de la Moción de Sentencia Sumaria y la Oposición presentada.
>
> [...][26].

En cuanto a este particular, surge de la transcripción de la vista argumentativa lo siguiente:

> Lcdo. Méndez: O sea, que la solicitud de nosotros de por ejemplo tomarle la deposición a los demandantes que estén vivos...
>
> Honorable Juez: Licenciado, en este momento...

---

[23] Apéndice del Recurso de Apelación, págs. 4289-4290.
[24] Apéndice del Recurso de Apelación, págs. 4298-4341.
[25] Apéndice del Recurso de Apelación, pág. 4332.
[26] Apéndice del Recurso de Apelación, pág. 4334.

Lcdo. Méndez: ¿Esa no está resuelta?

Honorable Juez: … lo que hemos indicado es la prueba pericial.

Lcdo. Méndez: Por eso. ¿Pero no es que se esté rechazando el resto de la prueba en los méritos? Eso es lo que quiero tener claro.

Honorable Juez: No necesariamente. Tienen que esperar la determinación por escrito. [...][27].

Además, **el TPI determinó que las deposiciones de los peritos de las partes debían de tomarse en o antes de 15 de diciembre de 2023**[28].

El 14 de noviembre de 2023, las partes presentaron ante la consideración del TPI una *Moción conjunta informativa en torno a acuerdo alcanzado sobre deposiciones de peritos y acuerdos alcanzados*[29]. En su escrito, notificaron que las deposiciones fueron recalendarizadas para enero y febrero de 2024. El 15 de noviembre de 2023, notificada el 17 de noviembre de 2023, el TPI emitió *Orden* en la que indicó "Enterado" en cuanto a la referida moción[30].

El 20 de diciembre de 2023, notificada el 22 de diciembre de 2023, el TPI emitió *Sentencia Parcial*[31] en la que declaró *Ha Lugar* la *Moción de Sentencia Sumaria* presentada por la parte apelada. En esta, formuló las siguientes determinaciones de hechos incontrovertidos:

1. El 21 de septiembre de 2001 la empresa Teléfonos Públicos de Puerto Rico (TPPR), quien se dedicaba a proveer servicio de teléfonos públicos a través de la Isla, presentó ante la Junta Reglamentadora de Telecomunicaciones ("JRT") una Querella contra PRTC, bajo el número JRT-01-Q-0093.

2. Allí la querellante TPPR alegó que PRTC le cobraba un cargo de $2.50 por línea por concepto del servicio de tele-tecla, y que dicho cargo violaba la Ley de Telecomunicaciones de Puerto Rico, pues no estaba basado en costos.

3. TPPR solicitó en su Querella: (i) que la JRT declarase nula e ilegal la tarifa por concepto del servicio de tele-tecla; (ii) que fijase una tarifa para el servicio de tele-tecla basada en costos; y (iii) que ordenara a PRTC proveerle un reembolso

---

[27] Apéndice del Recurso de Apelación, págs. 4334-4335.
[28] Apéndice del Recurso de Apelación, pág. 4341.
[29] Apéndice del Recurso de Apelación, págs. 5045-5047.
[30] Apéndice del Recurso de Apelación, pág. 5048.
[31] Apéndice del Recurso de Apelación, págs. 5082-5114.

retroactivo por el monto total de las tarifas cobradas ilegalmente por el servicio de tele-tecla.

4. El 23 de octubre de 2001 PRTC presentó su Contestación a la referida Querella, defendiendo la validez y legalidad del cargo por concepto del servicio de tele-tecla y negó que dicha tarifa no estuviese basada en costos.

5. La querellante TPPR presentó una solicitud de Resolución Declaratoria para que la JRT estableciera una metodología a los fines de fijar una tarifa para el servicio de tele-tecla basada en costos; a lo cual PRTC se opuso.

6. Atendidas todas las alegaciones y mociones antes mencionadas, la JRT emitió una Resolución el 5 de diciembre de 2001, mediante la cual les ordenó a las partes comparecer a una vista para presentar evidencia sobre si PRTC ya había recuperado o no la inversión inicial hecha para establecer el servicio de tele-tecla. Ello, dirigido a determinar si el cargo de tele-tecla impugnado estaba basado en el costo que el mismo le representaba a PRTC, *ergo*, si el mismo cumplía con la Ley de Telecomunicaciones.

7. El 4 de marzo de 2002, PRTC se allanó a que la JRT concediera los remedios solicitados por la TPPR en su Querella. En particular, PRTC se allanó a: (i) dejar de cobrarle a la TPPR el cargo por concepto de tele-tecla y; (ii) proveerle un crédito retroactivo la TPPR por la totalidad del dinero que le cobró por concepto del servicio de tele-tecla.

8. PRTC tomó esa determinación por su cuenta y así lo informó a la JRT, sin haber suscrito acuerdo de desistimiento alguno con TPPR. *("PRTC recently communicated its decisions regarding the touchtone tariff charges to TPPR and has endeavored to obtain a formal settlement of this controversy. Despite the fact that no legal controversy remains between the parties, PRTC has been unable to obtain a formal settlement from TPPR").*

9. La querellada PRTC solicitó la desestimación de la Querella, por entender que ya había satisfecho todos los reclamos legales formulados por TPPR. *("PRTC's actions in this regard clearly satisfy the legal concerns set forth in TPPR's complaint. Accordingly, this proceeding is moot and further proceedings are unnecessary").*

10. PRTC expresó en ese escrito que con su determinación la continuación del procedimiento se tornaba innecesaria. *("PRTC's decision to issue a credit to TPPR for all past touchtone tariff charges and PRTC's open commitment before this Board that it will not impose such charges on TPPR in the future clearly renders the touchtone tariff controversy between TPPR and PRTC moot and any further action in this proceeding unnecessary").*

11. Posteriormente, ante la oposición de la Querellante, PRTC reiteró su solicitud de desestimación, bajo el argumento de que ya había satisfecho la Querella de TPPR en su totalidad.

12. PRTC expresó que no estaba imponiendo sus términos para una transacción, sino que había concedido a TPPR el remedio solicitado. *("PRTC is not 'imposing' settlement terms to TPPR. Rather, PRTC is granting TPPR's remedy").*

13. Según PRTC, la querellante TPPR se opuso a la solicitud de desestimación porque entendía que lo ofrecido por dicha

querellada no satisfizo todos sus reclamos legales. En específico, la TPPR solicitaba que PRTC le eliminara el cargo de la tele-tecla, no solo a dicha entidad querellante, sino que esa tarifa fuera declarada "ilegal, nula e inválida en general". *("… TPPR's opposition disingenuously argues that PRTC has not fully satisfied TPPR's Complaint. Specifically, TPPR alleges that its Complaint 'requested that the business touchtone tariff be declared illegal, null and void' in general")*.

14. Se desprende de lo anterior que en el pleito con TPPR, PRTC inicialmente negó las alegaciones de la Querella de TPPR y defendió la validez del cargo por concepto del servicio de tele-tecla. Sin embargo, PRTC luego dejó de defender tal postura y se allanó a todos los reclamos legales formulados en la referida Querella, que incluían como alegación principal que el cargo de tele-tecla era ilegal por no estar basado en costos. Es decir, PRTC se allanó a que se concediese todo lo reclamado en la Querella y, cónsono con ello, se comprometió a dejar de cobrarle para siempre el cargo de tele-tecla a TPPR, al tiempo que le reembolsó todo el dinero que por concepto de tele-tecla le cobró a dicha empresa.

15. PRTC accedió a los remedios solicitados por TPPR y efectivo al 2001, eliminó el cargo por concepto de tele-tecla y le reembolsó lo que le había cobrado ilegalmente. No obstante, según ella misma reconoció, PRTC continuó cobrando dicho cargo a los consumidores miembros de las clases aquí demandantes hasta el 1 de diciembre de 2003. *("PRTC shall eliminate all Touch Tone charges for all customers beginning December 1, 2003. PRTC shall not charge for Touch Tone, or its equivalent, as a separate line item on any customer bill in the future.")*.

16. Según comunicaciones del Lcdo. Philip J. Mause al Lcdo. Edwin Quiñones, fechada de 21 de febrero de 2002 y la contestación del Lcdo. Frank A. Rullán al licenciado Philip Mause, en relación a esa misma carta, fechada de 25 de abril de 2002, el total que PRTC rembolsó a TPPR ascendió a $300,000.00 y así acordaron las partes de ese Primer Pleito que se le informaría a la JRT.

17. PRTC admitió la autenticidad y el contenido de las comunicaciones de 21 de febrero de 2002 y 25 de abril de 2002, entre los licenciados Philip Mause y Frank A. Rullan. PRTC afirmó que la función de tele-tecla o la capacidad de Señal de Multifre[c]uencia de Doble Tono ("DTMF", por sus siglas en inglés) en una oficina clase 5 no tiene una inversión incremental identificable.

18. Al momento de facturar por tele-tecla, PRTC no realizó ningún estudio en cuanto a si el tiempo que transcurre al marcar un número de teléfono es más corto o más largo utilizando el servicio de tele-tecla o sistema de discado.

19. La utilización de DTMF reduce en un 90% el tiempo de discado de una llamada, lo que hace que los requerimientos de equipo para la detección de pulsos sea menor. Esto, a su vez, reduce la provisión de recursos en "software" para almacenar los dígitos. Mientras más rápido se reciban los dígitos, menor es la cantidad de memoria requerida para almacenar.

20. La capacidad del discado de tele-tecla y pulso es inherente en los interruptores digitales modernos. Por tanto, en términos de inversión no hay diferencia en el costo. Los equipos digitales que utiliza hoy día PRTC tienen integrados

la capacidad del servicio de tele-tecla y pulso. Por ende, en términos de inversión no hay diferencia en costo entre uno y otro.

21. A pesar de que PRTC cobró distintas tarifas a las clases demandantes, esta reconoce que debido a que una línea comercial, línea residencial y línea de teléfonos públicos, tienen la misma expectativa de uso, no hay diferencia en el costo de proveer el servicio de tele-tecla.

22. PRTC cesó de facturar por el servicio de tele-tecla efectivo el 1 de diciembre de 2003, según alega, como producto de una decisión corporativa. Al requerírsele su producción, no pudo ofrecer ningún estudio de costo, cálculo o análisis para apoyar esa determinación.

23. Al preguntársele a PRTC en qué consiste su postura de que la tarifa de tele-tecla si está basada en costo y solicitarle la producción de los documentos en los que se basaba dicha defensa, PRTC objetó la pregunta y no proveyó documento alguno.

24. Al perito Don J. Wood le fue requerido por la parte demandante en el caso de epígrafe, que examinara lo siguiente: (1) las alegaciones; (2) el descubrimiento de prueba llevado a cabo en el caso de epígrafe y; (3) la Ley de 1996, conocida como la Ley de Telecomunicaciones de Puerto Rico.

25. El señor Wood es el principal en la firma de Wood & Wood, que es una firma de consultoría económica y financiera. Allí, el señor Wood provee análisis financiero, económico y regulatorio sobre las telecomunicaciones y sobre industrias de convergencia relacionadas, con énfasis en el costo del servicio.

26. El señor Wood cuenta con un Bachillerato en finanzas de la Universidad de Emory, y una Maestría con concentraciones en finanzas y microeconomía de la Universidad William and Mary.

27. El señor Wood tomó cursos relacionados a redes de telecomunicaciones y costo en Bell Communications Research (luego Tercodia); desarrolló y aplicó modelos de costo para identificar y cuantificar costos de redes locales; y ofreció cursos profesionales en esta área.

28. El perito Wood está certificado como analista tasador y erudito en análisis financiero forense; y es miembro de la Asociación Nacional de Tasadores y Analistas Certificados.

29. El señor Wood trabajó en la industria de intercambio local, en la División de Precios, Economía y Costos de Servicio de BellSouth Services, Inc. Además, trabajó en la industria de intercambio MCI Telecommunications Corporation, donde fue Gerente de Análisis regulatorio para la División Sur. Luego se desempeñó como Gerente en la Organización de Análisis Económico y Asuntos Regulatorios de MCI.

30. El señor Wood ha testificado sobre problemas de costos de telecomunicaciones ante las comisiones reguladoras de cuarenta y tres (43) estados, el Distrito de Columbia y en Puerto Rico. Además, ha prestado testimonio como experto sobre cuestiones de costos de telecomunicaciones en tribunales estatales, federales y extranjeros, ante tribunales alternativos de resolución de disputas y en la Comisión Federal de Comunicaciones. Específicamente, ha prestado

testimonio sobre los costos de los elementos de la red de telecomunicaciones utilizados por acarreadores de intercambio local grandes, así como pequeños, para proporcionar servicios de intercambio local (incluidos los elementos de conmutación locales en cuestión en este caso).

31. DTMF (tele-tecla) es la forma de señalización de la que dependen cada uno de los sistemas utilizados por la PRTC, los cuales no requieren inversión adicional, y que, además, ninguno de fabricantes cobra a los Acarreadores de Intercambio Local tarifa alguna para obtener o utilizar esta capacidad integrada.

32. DTMF es una capacidad cuya implementación reduce los costos de conmutación local de PRTC.

33. La tarifa de PRTC tampoco se basa en el costo porque esta no incurre en costos adicionales para proporcionar el servicio a cualquier tipo de cliente. Inclusive, si se pudiera identificar dicho costo, este no variaría según el tipo de cliente, por lo cual las tarifas que varían según el tipo de cliente no pueden basarse en el costo.

34. La estructura en la que PRTC basa sus tarifas también es inconsistente con la disposición §265(m) de la Ley 213, *supra.*

35. Luego de revisar estudios de acarreadores de servicio conmutado incumbentes en sobre más de 250 ocasiones, referente a los cincuenta (50) estados, el Distrito de Columbia, Guam y Puerto Rico, el señor Wood no encontró estudio alguno realizado que haya identificado un costo asociado a la utilización de la tecnología DTMF o para proveer tele-tecla.

36. Dos (2) reguladores estatales abordaron el asunto (sobre si las tarifas de *touchtone*/tele-tecla tienen una base de costo) durante el periodo en cuestión. En cada caso, el regulador eliminó el cargo por *touchtone*/tele-tecla después de que el acarreador de intercambio local reconociera que no había costo correspondiente para esta función.

37. Las acciones de PRTC, en respuesta a la demanda presentada por TPPR, son completamente consistentes con la conclusión de que PRTC no incurrió en gastos para proveer la función de DTMF y, por lo tanto, las tarifas impuestas para tele-tecla no son basadas en costo.

38. Para cuantificar el número de líneas en servicio por tipo de consumidor, a los cuales les fueron aplicados cargos por el servicio de tele-tecla, el señor Wood analizó la siguiente data: (1) las respuestas de PRTC en el descubrimiento de prueba relacionadas al número de líneas, tipo de consumidor y mes, referente al periodo en cuestión; (2) los datos reportados anualmente por PRTC al Sistema de Información de Gestión de Informes Autorizados (Automated Reporting Management Information System o "ARMIS", por sus siglas en inglés) y; (3) el Informe Anual Estadístico de Operadores Comunes de Comunicaciones reportado al Federal Communications Commission ("FCC") por PRTC.

39. En sus contestaciones a interrogatorios, PRTC certificó el número de líneas a las que le proveyó servicio desde diciembre de 1996 hasta diciembre de 2003.

40. Para realizar un análisis mensual de la cantidad cobrada por *touchtone*/tele-tecla para los años 1999-2003, el señor Wood aceptó la cantidad de líneas de servicios certificadas por PRTC en el descubrimiento de prueba.

41. El recuento mensual de línea para cada cliente (Clase A: Residencia, Clase B: Negocio de línea única, y Clase C: Negocio múltiple) y para cada mes del periodo en controversia (septiembre de 1996 a noviembre de 2003), se expone en el Anexo DJW-3 del informe pericial rendido por Don Wood.

42. ARMIS se inició en 1987 para recopilar datos financieros y operativos de los operadores de intercambio locales que cumplen con un umbral de tamaño designado.

43. Cada año, PRTC reporta al ARMIS los datos requeridos, cuya precisión es certificada por una declaración jurada de un funcionario de la compañía.

44. La tabla 43-08 III del ARMIS, recoge el número de líneas en servicio que según PRTC estaban activas al final de cada año natural, identificadas por tipo de línea comercial o residencial. Según dicha tabla, para el 1996 PRTC tenía 275,174 líneas comerciales y 899,982 líneas residenciales; para el 1997 PRTC tenía 292,031 comerciales y 950,787 residenciales; para el 1998 PRTC tenía 291,856 líneas comerciales y 947,857 líneas residenciales; para el 1999 PRTC tenía 309,094 líneas comerciales y 960,595 líneas residenciales; para el 2000 PRTC tenía 313,595 líneas comerciales y 976,165 líneas residenciales; para el 2001 PRTC tenía 331,767 líneas comerciales y 961,680 líneas residenciales; para el 2002 PRTC tenía 315,434 líneas comerciales y 958,823 líneas residenciales; para el 2003 PRTC tenía 286,438 líneas comerciales y 941,793 líneas residenciales.

45. Según la información que publica la FCC para ese periodo, PRTC tenía las siguientes cantidades de líneas: para el 1995 PRTC tenía 250,032 líneas comerciales y 865,572 líneas residenciales; para el 1996 PRTC tenía 275,174 líneas comerciales y 899,982 líneas residenciales; para el 1997 PRTC tenía 292,031 comerciales y 950,787 residenciales; para el 1998 tenía 291,856 líneas comerciales y 947,857 líneas residenciales; para el 1999 PRTC tenía 309,094 líneas comerciales y 960,595 líneas residenciales; para el 2000 PRTC tenía 315,853 líneas comerciales y 973,760 líneas residenciales; para el 2001 PRTC tenía 311,941 líneas comerciales y 964,969 líneas residenciales; para el 2002 PRTC tenía 334,980 líneas comerciales y 957,127 líneas residenciales y para el 2003 PRTC tenía 288,678 líneas comerciales y 941,554 líneas residenciales.

46. Para cada año del periodo de tiempo en cuestión en este caso, PRTC ha informado un número significativo mayor de líneas totales en servicio por clase de cliente de lo que ha informado durante el descubrimiento como el número de líneas, por clase de cliente, que se proporcionan (y cobraron por) *touchtone*/tele-tecla. Esta diferencia respalda el uso de los recuentos de líneas informados por PRTC para *touchtone*/tele-tecla como un valor razonable y conservador.

47. PRTC cobró a sus abonados de "estación principal residencial" la cuantía de $0.50 por el servicio de tele-tecla durante el periodo comprendido entre el 12 de septiembre de 1996 y el 30 de noviembre de 2003.

48. PRTC cobró a sus abonados de "estación principal de negocio" la cuantía de $2.50 por el servicio de tele-tecla, durante el periodo comprendido entre el 12 de septiembre de 1996 y el 30 de noviembre de 2003.

49. PRTC cobró a sus abonados de "línea principal de negocio" la cuantía de $3.75 por el servicio de tele-tecla, durante el periodo comprendido entre el 12 de septiembre de 1996 y el 30 de noviembre de 2003.

50. A base de esa información, el perito de la parte demandante aplicó el cargo mensual para cada clase de consumidor al número de líneas que PRTC reportó que facturó por *touchtone*/tele-tecla. Los resultados de dicho cálculo se pueden resumir de la siguiente manera: Demandantes Clase A - $32,574,338; Demandantes Clase B - $25,780,986; Demandantes Clase C - $16,074,262. En total, PRTC facturó a todos los miembros de las clases demandantes $74,429,586.

51. El daño financiero sufrido por los usuarios (consumidores) es la diferencia entre la cantidad realmente cobrada y el nivel de una tarifa basada en el costo del servicio.

52. De conformidad con los cargos impuestos a cada tipo de usuario y el número de líneas en servicio (por tipo de consumidor) durante el período en cuestión (12 de septiembre de 1996 al 30 de noviembre de 2003), la cantidad total que PRTC les facturó a los usuarios (y la cantidad por la cual las tarifas cobradas excedieron el costo subyacente) fue la siguiente: **Clase A [$32,574,338]; Clase B, $25,780,986 y Clase C-$16,074,262; para un total de $74,429,586.**

El TPI concluyó que consideraba innecesario escuchar las opiniones periciales y declaró *No Ha Lugar* el descubrimiento de prueba solicitado por la PRTC[32]. En consecuencia, el foro primario ordenó a la PRTC pagar las siguientes partidas en concepto de daños a la parte apelada: Clase A [$32,574,338], Clase B-$25,780,986, y Clase C-$16,074,262, para un subtotal de $74,429,586, más la doble penalidad reconocida en la Ley Núm. 118-2013, intereses al 9.25%, costas y honorarios de abogados al 25%.

Inconforme con el dictamen, la parte apelante presentó el recurso de epígrafe, en el que señala al TPI la comisión de los siguientes errores:

ERRÓ Y ACTUÓ ARBITRARIAMENTE EL TPI AL DICTAR SENTENCIA SUMARIA: (A) ACOGIENDO CASI *AD VERBATIM* LOS HECHOS PROPUESTOS POR LA PARTE DEMANDANTE, PASANDO POR ALTO QUE LOS MISMOS NO ESTABLECEN LA ILEGALIDAD DEL CARGO EN CUESTIÓN

---

[32] Apéndice del Recurso de Apelación, pág. 5112.

O, EN LA ALTERNATIVA, FUERON CONTROVERTIDOS POR PRTC, E IGNORANDO COMPLETAMENTE LOS 29 HECHOS INCONTROVERTIDOS Y MATERIALES SOMETIDOS POR PRTC; Y, (B) BASANDO SU DICTAMEN EN PRUEBA INADMISIBLE.

ERRÓ EL TPI AL DICTAR SENTENCIA SUMARIA APLICANDO LAS DOCTRINAS DE IMPEDIMENTO COLATERAL POR SENTENCIA Y JUDICIAL ESTOPPEL, Y ADJUDICANDO CAUSAS DE ACCIÓN SOBRE ENRIQUECIMIENTO INJUSTO Y COBRO DE LO INDEBIDO, QUE NO FUERON ALEGADAS EN LA DEMANDA.

ERRÓ EL TPI AL DICTAR SENTENCIA SUMARIA DE MANERA PREMATURA, EN VIOLACIÓN AL DEBIDO PROCESO DE LEY DE PRTC, SIN PERMITIR EL DESCUBRIMIENTO DE PRUEBA QUE YA HABÍA AUTORIZADO Y DENEGANDO LA MOCIÓN PARA COMPELER PRESENTADA POR PRTC.

ERRÓ EL TPI AL CONCEDER INTERESES Y HONORARIOS DE ABOGADOS TRAS CONCLUIR QUE PRTC PROLONGÓ ESTE LITIGIO POR MÁS DE VEINTE (20) AÑOS, Y ORDENAR QUE LAS CUANTÍAS NO RECLAMADAS INGRESEN EN UN FONDO ESPECIAL BAJO UN ESTATUTO INAPLICABLE.

El 20 de febrero de 2024, la parte apelada compareció mediante *Alegato en Oposición*. Ambas partes solicitaron presentar sus escritos en exceso de páginas al amparo de la Regla 70(D) y Regla 73(E) del Reglamento de este Tribunal, respectivamente, las cuales aprobamos.

Con el beneficio de la comparecencia de las partes, procedemos a resolver.

**II.**

**-A-**

El Tribunal Supremo de Puerto Rico ha expresado en varias ocasiones que la sentencia sumaria es un remedio extraordinario y discrecional[33] que sólo se debe conceder cuando no existe una controversia genuina de hechos materiales y lo que resta es aplicar el derecho[34]. En términos generales, al dictar sentencia sumaria, el tribunal deberá hacer lo siguiente:

---

[33] *Birriel Colón v. Econo y Otros*, 2023 TSPR 120, 213 DPR ___ (2023); *Serrano Picón v. Multinational Life Ins.*, 2023 TSPR 118, 212 DPR ___ (2023); *González Meléndez v. Mun. San Juan*, 2023 TSPR 95, 212 DPR ___ (2023); *Segarra Rivera v. Int'l Shipping et al.*, 208 DPR 964 (2022); *Delgado Adorno v. Foot Locker Retail*, 208 DPR 622 (2022); *Maldonado v. Cruz*, 161 DPR 1, 39 (2004).
[34] *Serrano Picón v. Multinational Life Ins.*, *supra*.

(1) analizar los documentos que acompañan la solicitud de sentencia sumaria y los que se incluyen con la moción en oposición, así como aquellos que obren en el expediente del tribunal;

(2) determinar si el oponente de la moción controvirtió algún hecho material y esencial, o si hay alegaciones de la demanda que no han sido controvertidas o refutadas en forma alguna por los documentos[35].

Analizados estos criterios, el tribunal no dictará sentencia sumaria cuando existan hechos materiales y esenciales controvertidos; cuando haya alegaciones afirmativas en la demanda que no han sido refutadas; cuando surja de los propios documentos que acompañan la moción una controversia real sobre algún hecho material y esencial, o cuando como cuestión de derecho, no procede[36]. La sentencia sumaria se puede dictar a favor o en contra de la parte que la solicita, según proceda en Derecho[37].

Por tratarse de un remedio discrecional, el uso del mecanismo de sentencia sumaria tiene que ser mesurado y solo procederá cuando el tribunal quede claramente convencido de que tiene ante sí documentos no controvertidos[38]. Es importante mencionar que, este Tribunal utilizará los mismos criterios que el Tribunal de Primera Instancia al determinar si procede una moción de sentencia sumaria[39].

Los criterios que este foro intermedio debe tener presentes al atender la revisión de una sentencia sumaria son los siguientes:

1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra,* y la jurisprudencia le exigen al foro primario;

2) revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36, *supra*;

3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos;

---

[35] *Vera v. Dr. Bravo*, 161 DPR 308, 334 (2004).
[36] *Íd.*, págs. 333-334.
[37] *Maldonado v. Cruz, supra.*
[38] *Íd.*, pág. 334.
[39] *Íd.*

4) y de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia[40].

En lo pertinente al término para presentar una solicitud de sentencia sumaria, la Regla 36.2 de las Reglas de Procedimiento Civil dispone lo siguiente:

> Una parte contra la cual se haya formulado una reclamación podrá presentar, a partir de la fecha en que fue emplazado **pero no más tarde de los treinta (30) días siguientes a la fecha límite establecida por el tribunal para concluir el descubrimiento de prueba**, una moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación[41].(Énfasis suplido).

**-B-**

El descubrimiento de prueba permite a las partes descubrir, obtener o perpetuar la prueba necesaria para sustentar sus alegaciones en el acto del juicio. Además, está basado en el principio básico de que antes del juicio, las partes tienen derecho a descubrir toda información relacionada con su caso, independientemente de quién la posea. Las normas que regulan el procedimiento de descubrimiento de prueba persiguen los siguientes propósitos: 1) precisar los asuntos en controversia, 2) obtener evidencia para ser utilizada en el juicio, evitando una sorpresa en esta etapa de los procedimientos, 3) facilitar la búsqueda de la verdad y 4) perpetuar evidencia. Su finalidad es permitir que las partes puedan prepararse para el juicio, de forma tal que tengan la oportunidad de obtener la evidencia necesaria para evaluar y resolver las controversias del caso[42].

El alcance del descubrimiento de prueba debe ser amplio y liberal. Esta política tiene el efecto de facilitar la tramitación de los pleitos y evitar los inconvenientes, sorpresas e injusticias que

---

[40] *Roldán Flores v. M. Cuebas, et al.,* 199 DPR 664, 679 (2018).
[41] 32 LPRA Ap. V, R. 36.2.
[42] *Rivera y otros v. Bco. Popular,* 152 DPR 140, 151-152 (2000).

surgen, cuando las partes ignoran hasta el día de la vista las cuestiones y los hechos que en realidad son objeto del litigio. Además, permite a las partes precisar con exactitud los hechos en controversia, ya que en nuestro ordenamiento procesal el propósito de la demanda es notificar a grandes rasgos cuáles son las reclamaciones y defensas de las partes. Únicamente está limitado a que la información objeto del descubrimiento, no sea privilegiada y que la misma sea pertinente a la controversia[43].

Los tribunales de instancia tienen amplia discreción para regular el ámbito del descubrimiento de prueba, ya que están obligados a garantizar una solución justa, rápida y económica del caso, sin ventaja para ninguna de las partes. Al establecer el término para realizar el descubrimiento de prueba, deben hacer un balance entre dos intereses de gran importancia, de una parte, garantizar la pronta solución de las controversias y de otra, velar que las partes tengan la oportunidad de realizar un amplio descubrimiento, para que en la vista en su fondo no surjan sorpresas. El fin del descubrimiento de prueba es que las partes obtengan la información necesaria para la preparación del juicio, con el objetivo de que puedan precisar los asuntos en controversia y descubrir la verdad de lo ocurrido. Para dar cumplimiento a ese objetivo, los tribunales deben conceder un tiempo razonable para que ambas partes puedan completar su descubrimiento, evaluar la información obtenida, y así estar en mejor posición de presentar su caso[44].

Una parte podrá requerir de la otra una lista de las personas testigos que la parte solicitada intenta utilizar en el juicio, así como un resumen breve de lo que se propone declarar cada uno[45].

---

[43] Regla 23.1 de Procedimiento Civil, 32 LPRA Ap. V. *Rivera y otros v. Bco. Popular, supra,* págs. 152-153; *Alver Maldonado v. Ernst & Young, LLP,* 191 DPR 921, 925 (2014).
[44] *Rivera y otros v Bco. Popular, supra,* págs. 154-155.
[45] 32 LPRA Ap. V., R.23.1.

Por otro lado, el descubrimiento de prueba pericial permite que una parte requiera a otra el nombre y dirección de los peritos consultados y de los que intente presentar en el juicio, la materia sobre la cual van a declarar, un resumen de sus opiniones y una breve expresión de las teorías que sostienen su opinión[46]. Las Reglas de Procedimiento Civil de 2009, no establecen un término final específico para concluir el descubrimiento de prueba, porque ese período dependerá de las características particulares del caso[47].

En aquellas circunstancias donde se solicita al juzgador que, por no existir controversia sobre hechos materiales, se dicte sentencia sumaria, el descubrimiento de prueba puede resultar esencial por incidir en el derecho al debido proceso de ley que cobija al litigante. En tales casos, podría resultar indispensable para el que se opone a que se dicte sentencia sumaria el tener la oportunidad de realizar un descubrimiento de prueba adecuado que le permita derrotar la contención del promovente.  Por ello, se ha establecido que, en circunstancias particulares, resulta adecuado aplazar la disposición de una moción de sentencia sumaria hasta tanto no concluya el proceso de descubrimiento de prueba, de forma tal que la parte promovida tenga la oportunidad de refutarla debidamente[48]. Resultaría prematuro resolver una moción de sentencia sumaria sin que se haya concedido la oportunidad de efectuar un descubrimiento de prueba[49].

Las propias Reglas de Procedimiento Civil contemplan la situación en que el promovido por una moción de sentencia sumaria no ha tenido la oportunidad adecuada para conseguir prueba para

---

[46] 32 LPRA Ap. V., R. 23.1 (c).
[47] J Echevarría Vargas, *Procedimiento Civil Puertorriqueño*, 1ra. ed., Colombia, 2012, pág. 170.
[48] *Santiago v. Ríos Alonso*, 156 DPR 181 (2002), *Pérez v. El Vocero de P.R.*, 149 DPR 427 (1999), *Ramos Pérez v. Univisión*, 178 DPR 200, (2010).
[49] *Íd.*

apoyar alguno de los hechos esenciales que justificarían su oposición, disponiendo que:

> **Regla 36.6. Cuando no puedan obtenerse declaraciones juradas**. (32 LPRA Ap. V, R. 36.6)
>
> Si de las declaraciones juradas de la parte que se oponga a la moción resulta que ésta no puede, por las razones allí expuestas, presentar mediante declaraciones juradas hechos esenciales para justificar su oposición, el tribunal podrá denegar la solicitud de sentencia o posponer su consideración concediéndole a la parte promovida un término razonable para que pueda obtener declaraciones juradas, tomar deposiciones, conseguir que la otra parte le facilite cierta evidencia, o dictar cualquier otra orden que sea justa.

Tal disposición está en armonía con la filosofía procesal de velar por que los procedimientos garanticen la solución justa, rápida y económica de las controversias[50]. Por ello, el fin perseguido por el mecanismo sumario, a saber: la solución y tramitación rápida de los casos, **queda supeditado al principio de alcanzar una decisión justa[51].** Confrontado el Tribunal con una solicitud de sentencia sumaria, éste puede, en el ejercicio de su discreción, posponer la evaluación de la moción para viabilizar el principio procesal de hacer justicia al resolver las controversias[52].

**-C-**

En nuestro ordenamiento jurídico es norma legal que el criterio del juez de la corte primaria prevalezca si se funda a base de razonabilidad y no resulta perjudicial a los derechos sustanciales de una parte. Además, como regla general no entraremos o sustituiremos el discernimiento utilizado por el juez que atiende los procesos, salvo, que haya incurrido en prejuicio, parcialidad, error manifiesto o error en el ejercicio de su discreción[53].

De otra parte, cuando se alega que en la actuación judicial se incurrió en pasión, prejuicio o parcialidad, los foros apelativos

---

[50] 32 LPRA Ap. III, R. 1.
[51] *García Rivera et. al. v. Enríquez*, 153 DPR 323 (2001).
[52] *Pérez v. El Vocero de P.R.*, *supra*.
[53] *Trans-Oceanic Life Ins. v. Oracle Corp.*, 184 DPR 689, 709 (2012), *Lluch v. España Services Sta.*, 117 DPR 729, 745 (1986).

debemos verificar primordialmente si el juez del Tribunal de Primera Instancia cumplió con su función de adjudicar de manera imparcial, pues solo así podrán descansar en sus determinaciones de hechos.

En cuanto al error manifiesto, este ocurre cuando, de un análisis de la totalidad de la evidencia, el foro apelativo queda convencido de que se cometió un error, aunque haya prueba que sostenga las conclusiones de hecho del tribunal. Así pues, se incurre en error manifiesto cuando la apreciación de la prueba se distancia de la realidad fáctica o es inherentemente imposible o increíble. Esto, particularmente cuando el foro primario descansa exclusivamente en una parte de la prueba, cuando hubo otra que la contradice.

Ahora bien, el error que hace que no se guarde deferencia al foro sentenciador debe ser manifiesto[54]. Entiéndase, un foro apelativo no debe elaborar sobre la pasión, el prejuicio y la parcialidad si no puede fundamentar que esto ocurrió en el caso ante su consideración. Quien señale que el juzgador actuó mediante pasión, prejuicio o parcialidad debe sustentar sus alegaciones con evidencia suficiente, pues estas no deben convertirse en un instrumento para ejercer presión contra el Tribunal de Primera Instancia[55].

**-D-**

La Regla 408 de Evidencia[56], es una excepción a la regla de admisibilidad de evidencia pertinente por políticas extrínsecas. Según el profesor Ernesto Chiesa Aponte, "[l]a política pública que se quiere promover **es que las partes puedan transigir sus reclamaciones civiles. Para esto es necesario que hablen entre sí y hagan ofertas, sin temor a que, si no llegan a un acuerdo,**

---

[54] *Gómez Márquez v. Periódico El Oriental, Inc.*, 203 DPR 783 (2020).
[55] *Íd.*
[56] 32 LPRA A. VI, R. 408.

**se use como evidencia la oferta de transacción o las conversaciones habidas en el curso de las negociaciones**"[57]. (Énfasis nuestro).

El Tribunal Supremo de Puerto Rico ha resuelto que las comunicaciones protegidas por la precitada regla de exclusión de evidencia deben ser realizadas dentro del proceso de negociación, conducentes al contrato de transacción[58]. A su vez, dispuso que para que sean inadmisibles debe existir una controversia entre las partes al momento en que surgen las comunicaciones con miras al contrato de transacción[59]. Consecuentemente, el Tribunal Supremo determinó que se debe tratar *"[…] de una verdadera oferta y no de meras posiciones o comunicaciones de negocio entre las partes."* (Citas internas omitidas). La referida regla dispone que:

> (A) No es admisible para probar la validez o falta de validez de una reclamación, la cuantía reclamada o para impugnar a base de una declaración anterior inconsistente o por contradicción:
>     (1) Evidencia de que una persona: (a) ha provisto, ofrecido o prometido proveer, o (b) ha aceptado, ofrecido o prometido aceptar algo de valor, con el propósito de intentar o lograr transigir una reclamación cuando estaba en controversia su validez o la cuantía reclamada, o
>     (2) evidencia sobre conducta o declaraciones efectuadas durante gestiones dirigidas a transigir.
> (B) Esta regla no requiere la exclusión de evidencia que se ofrece para otros propósitos tales como impugnar por parcialidad o prejuicio a una persona testigo, refutar una alegación de demora indebida o probar un intento de obstruir una investigación o procedimiento criminal. Para fines de esta regla, no se considerará como intento de obstruir una investigación o procedimiento criminal, la conducta dirigida a transigir un delito cuya transacción está autorizada por las reglas de Procedimiento Criminal, el Código Penal o legislación especial.
> (C) Esta regla aplica en casos civiles y criminales.

**-E-**

En el caso *Rivera Gómez y otros v. Arcos Dorados Puerto Rico, Inc.,* 2023 TSPR 65, 212 DPR __ (2023), el Tribunal Supremo resalta la gran flexibilidad que existe en la etapa procesal del

---

[57] E.L. Chiesa, *Reglas de Evidencia de Puerto Rico 2009,* Publicaciones JTS, 2009, pág. 139.
[58] *Carpets & Rugs v. Tropical Reps,* 175 DPR 615, 631 (2009).
[59] *Íd.*

descubrimiento de prueba y la discreción que tienen los tribunales para regular dicho proceso. Sin embargo, a su vez resalta la importancia de que los tribunales, en el ejercicio de su discreción, ejerzan un balance razonable entre una solución justa, rápida y económica y el interés de garantizar un descubrimiento de prueba amplio y liberal[60].

De igual forma, nuestro más alto foro establece que el derecho a presentar prueba en apoyo de una reclamación es un eje central del debido proceso de ley por lo que excluir del juicio el testimonio de un perito esencial es equivalente a la medida extrema de desestimación[61]. A tales efectos, expresaron que esto solo se debe dar en circunstancias excepcionales[62].

Las Reglas 701 a la 709 de las Reglas de Evidencia de Puerto Rico[63], preceptúan todo lo relacionado a las opiniones y testimonio pericial. Particularmente, conforme a la Regla 702 de dicho estatuto, el perito es una persona quien, por su conocimiento científico, técnico o especializado puede formar una opinión que sea útil para el juzgador de los hechos[64]. Por ello, "[c]omo cualquier otro testigo, la función del perito es dar a conocer la verdad, derivada de su conocimiento especializado"[65].

**-F-**

Se reconoce en nuestro acervo jurídico la figura del impedimento colateral por sentencia como una modalidad de la doctrina de cosa juzgada[66]. El impedimento colateral por sentencia "surte efectos cuando un hecho esencial para el pronunciamiento de una sentencia se dilucida y se determina mediante sentencia válida y final, [y] tal determinación es concluyente en un segundo pleito

---

[60] *Íd.*
[61] *Íd.*
[62] *Íd.*
[63] 32 LPRA Ap. V.
[64] *SLG Font Bardón v. Mini-Warehouse*, 179 DPR 322, 338 (2010).
[65] *Rivera Gómez y otros v. Arcos Dorados Puerto Rico, Inc., supra.*
[66] *P.R. Wire Prod. v. C. Crespo & Asoc.*, 175 DPR 139 (2008).

entre las mismas partes, aunque estén envueltas causas de acción distintas"[67]. Es decir, el impedimento colateral por sentencia impide que se litigue, en un litigio posterior, un hecho esencial que fue adjudicado mediante sentencia final en un litigio anterior[68]. No obstante, a diferencia de la doctrina de cosa juzgada, la aplicación de la figura de impedimento colateral por sentencia no exige la identidad de causas, esto es, que la razón de pedir plasmada en la demanda sea la misma en ambos litigios[69].

Sobre la identidad de causas, en *A & P Gen. Contractors, Inc. v. Asoc. Caná, supra,* pág. 765, el Tribunal Supremo señaló que en el contexto particular de la doctrina de cosa juzgada y de impedimento colateral por sentencia, tal requisito significa el fundamento capital, es decir, el origen de las acciones o excepciones planteadas y resueltas.

Al igual que la doctrina de cosa juzgada, el propósito de la figura del impedimento colateral por sentencia es promover la economía procesal y judicial y amparar a los ciudadanos del acoso que necesariamente conlleva litigar en más de una ocasión hechos ya adjudicados[70]. El impedimento colateral por sentencia se manifiesta en dos modalidades, la defensiva y la ofensiva[71]. La modalidad defensiva le permite al demandado levantar la defensa de impedimento colateral por sentencia, a los fines de impedir la litigación de un asunto levantado y perdido por el demandante en un pleito anterior frente a otra parte[72]. De otro lado, la modalidad ofensiva es articulada por el demandante en un litigio posterior para impedir que el demandado relitigue los asuntos ya dilucidados y perdidos frente a otra parte[73]. Como se puede apreciar, el

---

[67] *A & P Gen. Contractors, Inc. v. Asoc. Caná,* 110 DPR 753, 762 (1981).
[68] *P.R. Wire Prod. v. C. Crespo & Asoc., supra.*
[69] *Rodríguez v. Colberg,* 131 DPR 212, 219 (1989).
[70] *P.R. Wire Prod. v. C. Crespo & Asoc., supra.*
[71] *A & P Gen. Contractors, Inc. v. Asoc. Caná, supra,* pág. 758.
[72] *Íd.*
[73] *Íd.*

denominador común entre ambas modalidades es que la parte afectada por la interposición del impedimento colateral ha litigado y ha perdido el asunto en el pleito anterior[74].

Como corolario de lo anterior, es inevitable concluir que no procede la interposición de la doctrina de impedimento colateral por sentencia -ya sea en su vertiente ofensiva o defensiva- cuando la parte contra la cual se interpone (1) no ha tenido la oportunidad de litigar previamente el asunto y (2) no ha resultado ser la parte perdidosa en un litigio anterior[75].

Esbozada la normativa jurídica que enmarca la controversia de epígrafe, procedemos a resolver.

**III.**

En el presente caso, nos corresponde revisar la *Sentencia Parcial* emitida el 20 de diciembre de 2023, notificada el 22 de diciembre de 2023, por el TPI, la cual acoge en su totalidad la *Moción de Sentencia Sumaria* presentada por la parte apelada. Adelantamos que, a la luz del derecho expuesto, la determinación del TPI resulta patentemente errónea e injusta.

En primer lugar, discutiremos si las partes y el foro *a quo* cumplieron con los criterios de la Regla 36 de Procedimiento Civil, *supra,* y la jurisprudencia[76]. Posteriormente, discutiremos los errores señalados por la parte apelante.

De nuestra revisión de *novo,* surge que la *Moción de Sentencia Sumaria* presentada por la parte apelada incluyó la siguiente prueba documental:

1. Copia parcial del expediente JRT-01-Q-0093 entre TPPR v. PRTC
   a. *Complaint*
   b. Answer *of Puerto Rico Telephone Company to Complaint of Telefonos Públicos de Puerto Rico Inc.*
   c. *Opposition of Puerto Rico Telephone Company Inc. to Motion Requesting Declaratory Ruling and Order*

---

[74] *Íd.*; *P.R. Wire Prod. v. C. Crespo & Asoc., supra.*
[75] *Íd.*
[76] *Meléndez González et al. v. M. Cuebas, supra.*

    d. *Resolution and Order*

    e. *Puerto Rico Telephone Company Inc.'s Motion to Dismiss and Motion for Stay.*

    f. *Puerto Rico Telephone Company Inc.'s Reply to TPPR'S Opposition to Motion to Dismiss and Opposition to Motion to Compel*

2. Carta del 7 de noviembre de 2007 cursada entre la PRTC y la JRT

3. Anejo A sobre tasa de elementos y tasas (Attachment A *Rates Elements and Rates*) 1996-2001

4. Anejo B *DEM Projections*

5. Anejo C no fue presentado

6. Anejo D "*Board ordered pase-down calculations*"

7. Anejo E, *Board Ordered True-up Calculations*

8. Carta del 21 de febrero de 2002 del Bufete Dinker, Biddle & Reath LLC,

9. Carta de 25 de abril de 2002 del Bufete Quiñones & Sánchez, Contestación Suplementaria a Primer Interrogatorio y Requerimiento de Admisiones de Producción de Documentos de la parte apelante

10. Informe pericial juramentado en Estados Unidos, (titulado *Reply Affidavits*) y *curriculum vitae* del señor Don J Wood, Escala de tarifa para servicios adicionales Núm. de servicio de categoría Tele-tecla,

11. Contestación al Interrogatorio por parte PRTC (*PRTC Responses to plantiffs Discovery in original spanish*). Contestaciones y/u Objeciones a Requerimiento de Admisiones de PRTC

12. Contestaciones y/u Objeciones a Requerimiento de Admisiones e Interrogatorio Especial.

Por su parte, la PRTC presentó *Oposición a Moción de Sentencia Sumaria* e incluyó los siguientes documentos:

1. Carta 31 de julio de 2017 del Bufete Vicente & Cuebas

2. Carta 3 de agosto de 2018 del Bufete Vicente & Cuebas

3. Carta 2 de agosto de 2017 del Bufete Pietrantoni Méndez & Álvarez

4. Contestaciones al Interrogatorio Especial y Requerimiento de Producción de Documentos limitado a cada requerimiento negado

5. *Joint Stipulation and Motion to Dismiss*

6. Documento Confidencial Bajo Sello *Settlement Agreement Resolution and Order*

7. Expert Report of David C Blessing, notarizado por Bianca Dumiana Dsouza

8. Carta 30 de julio de 2017 del Commonwealth de Virginia

9. Background de David C. Blessing

10. Análisis de costos

11. Requerimiento de Admisiones e Interrogatorio Especial Admisiones e Interrogatorio Especial

12. Contestación y Objeciones a Primer Pliego de Interrogatorio y Requerimiento de Producción de Documentos

13. Escala de tarifas de servicios adicionales Núm. X Servicio de teléfono tele-tecla

14. Contestación Suplementaria a Primer Pliego de Interrogatorio y Requerimiento de Producción de Documentos
15. Información, educación y desarrollo profesional Ing. Roberto A. Correa
16. Curriculum Vitae Luis Caldero Sánchez
17. Professional Experience David C. Blessing
18. Contestación al Interrogatorio #22
19. Schedule of Rates, charges and regulations governing
20. Tariff Schedule applicable to Telephone Service of Frontier Communication of the Southwest Inc.
21. Carta fechada 7 de noviembre de 2003 de la PRTC a la JRT
22. Minuta del TPI del 21 de julio de 2017

Al examinar minuciosamente el expediente, surge que la *Moción de Sentencia Sumaria,* la *Oposición a Moción de Sentencia Sumaria* y la *Sentencia Parcial* no cumplen con los requisitos de la Regla 36 de las de Procedimiento Civil, *supra.* Veamos.

La *Moción de Sentencia Sumaria* instada por la parte apelada propuso cincuenta y tres (53) hechos sobre los cuales alegadamente no existía controversia. En síntesis, los hechos se pueden agrupar de la siguiente forma: del uno al diecisiete (1 al 17) giran en torno a la alegada admisión realizada por la PRTC en el caso JRT-01-Q-0093 ante la JRT entre TPPR y la PRTC. Los hechos del dieciocho al veinticuatro (18 al 24), cuarenta (40), cuarenta y ocho (48), cuarenta y nueve (49) y cincuenta (50) alegadamente sustentan admisiones relacionadas a la función de la tele-tecla. Por ejemplo, que la PRTC no realizó un estudio sobre duración del servicio de tele-tecla, que a su vez la PRTC cobró de diferentes tarifas conforme al uso de línea residencial, línea comercial, certificación de la PRTC sobre el servicio, cuantía cobrada por línea residencial, línea comercial y negocio. Alega la parte apelada que estas admisiones surgen de la producción de documentos y/o contestación a interrogatorio de la PRTC. Por otro lado, los hechos dieciocho al treinta y nueve (18 al 39), cuarenta y uno al cuarenta y siete (41 al 47) y cincuenta y uno al cincuenta y tres (51 al 53) son extractos del informe pericial preparado por el perito Wood.

El Tribunal Supremo ha determinado que para demostrar de manera efectiva la inexistencia de controversias de hechos, la parte promovente está obligada a exponer las alegaciones de las partes, desglosar los hechos sobre los cuales aduce que no hay controversia en párrafos debidamente numerados y para cada uno de ellos deberá especificar la página o párrafo de la declaración jurada u otra **prueba admisible en evidencia** que los apoye y las razones por las cuales debe ser dictada la sentencia sumaria argumentando el derecho aplicable[77].

Por otro lado, al examinar la *Oposición a Moción de Sentencia Sumaria,* la parte apelante se opuso a los hechos sobre los cuales no existe controversia, enunciados en la *Moción de Sentencia Sumaria,* a saber: Uno (1), dos (2), tres (3), cuatro (4), seis (6), siete (7), ocho (8), diez (10), once (11), doce (12), trece (13), catorce (14), quince (15), dieciséis (16), diecisiete (17), veinticuatro (24), veinticinco (25), veintiséis (26), veintisiete (27), veintiocho (28), veintinueve (29), treinta al cuarenta y siete (30 al 47), cincuenta y uno al cincuenta y tres (51 al 53). La parte apelante presentó varios documentos para refutar los hechos. Además, la parte apelante en la *Oposición a Moción de Sentencia Sumaria* propuso veintinueve (29) hechos esenciales y pertinentes sobre los cuales no existen controversia. La mayoría de estos surgen del informe pericial del perito Blessing, solamente los hechos propuestos diecisiete (17), veinticuatro (24) y veintiocho (28) surgen del Exhibit X de la *Moción de Sentencia Sumaria.*

Asimismo, al evaluar la *Oposición a Moción de Sentencia Sumaria,* la parte apelante realizó admisiones limitadas a la existencia del documento, pero no a la conclusión que pretende establecer la parte apelada en cuanto a hechos sobre los cuales no

---

[77] 32 LPRA Ap. V, R. 36.3(a)(1)(4); *SLG Zapata-Rivera v. J. F. Montalvo,* 189 DPR 414, 432 (2013).

existe controversia, propuestos por la parte apelada en su *Moción de Sentencia Sumaria*, a saber:

### HECHO #5 PROPUESTO POR LA PARTE DEMANDANTE:

5. Como parte del litigio, la querellante, TPPR, presentó una solicitud de Resolución Declaratoria para que la JRT estableciera una metodología a los fines de fijar una tarifa para el servicio de tele-tecla basada en costos. PRTC se opuso a la referida solicitud de Resolución Declaratoria.

### CONTESTACIÓN DE PRTC AL HECHO #5 PROPUESTO POR LA PARTE DEMANDANTE:

Asimismo, del Hecho #5 propuesto se admite únicamente que: (a) TPPR presentó un documento intitulado "Motion Requesting Declaratory Ruling and Order"; y (b) que PRTC se opuso. […]

[…]

### HECHO #9 PROPUESTO POR LA PARTE DEMANDANTE:

9. Con este proceder, la querellada PRTC solicitó la desestimación de la Querella, por entender que ya había satisfecho todos los reclamos legales formulados por TPPR en la misma. *("PRTC's actions in this regard clearly satisfy the legal concerns set forth in TPPR's complaint. Accordingly, this proceeding is moot and further proceedings are unnecessary").*

### CONTESTACIÓN DE PRTC AL HECHO #9 PROPUESTO POR LA PARTE DEMANDANTE:

Del Hecho propuesto #9, únicamente se admite que PRTC solicitó la desestimación de la querella [en el caso JRT-01-Q-0093 entre TPPR y PRTC]. Dicha desestimación estaba basada en el argumento de academicidad.

[…]

### HECHO #18 PROPUESTO POR LA PARTE DEMANDANTE:

18. PRTC afirmó que la función de tele-tecla o la capacidad de Señal de Multifre[c]uencia de Doble Tono ("DTMF", por sus siglas en inglés) en una oficina clase 5 no tiene una inversión incremental identificable.

### CONTESTACIÓN DE PRTC AL HECHO #18 PROPUESTO POR LA PARTE DEMANDANTE:

Se admite que PRTC entiende que la función de tele-tecla o la capacidad de DTMF en una oficina clase 5 no tiene una *inversión incremental identificable.* No obstante, ello no significa que la función no conlleve costos. […]

### HECHO #19 PROPUESTO POR LA PARTE DEMANDANTE:

19. Al momento de facturar por tele-tecla, PRTC no realizó ningún estudio en cuanto a si el tiempo que transcurre al marcar un número de teléfono es más corto o más largo utilizando el servicio de tele-tecla o sistema de discado.

**CONTESTACIÓN DE PRTC AL HECHO #19 PROPUESTO POR LA PARTE DEMANDANTE:**

El hecho propuesto #19 se admite. No obstante, se aclara que el mismo es totalmente inmaterial e impertinente a la controversia en cuestión. En el momento en que PRTC cobraba el cargo de tele-tecla el mismo, en unión a los otros cargos, iba dirigido a recuperar los costos totales de proveer el servicio local, más una ganancia razonable. […]

**HECHO #20 PROPUESTO POR LA PARTE DEMANDANTE:**

20. La utilización de DTMF reduce en un 90% el tiempo de discado de una llamada, lo que hace que los requerimientos de equipo para la detección de pulsos sea menor. Esto, a su vez, reduce la provisión de recursos en "software" para almacenar los dígitos. Mientras más rápido se reciban los dígitos, menor es la cantidad de memoria requerida para almacenar.

**HECHO #21 PROPUESTO POR LA PARTE DEMANDANTE:**

21. La capacidad del discado de tele-tecla y pulso es inherente en los interruptores digitales modernos. Por tanto, en términos de inversión no hay diferencia en el costo. Los equipos digitales que utiliza hoy día PRTC tienen integrados la capacidad del servicio de tele-tecla y pulso. Por ende, en términos de inversión no hay diferencia en costo entre uno y otro.

**CONTESTACIÓN DE PRTC AL HECHO #20 Y #21 PROPUESTOS POR LA PARTE DEMANDANTE:**

Se admite, pero se incorpora por referencia la cualificación al Hecho propuesto #19.

**HECHO #22 PROPUESTO POR LA PARTE DEMANDANTE:**

22. A pesar de que PRTC cobró distintas tarifas a las clases demandantes, esta reconoce que debido a que una línea comercial, línea residencial y línea de teléfonos públicos, tienen la misma expectativa de uso, no hay diferencia en el costo de proveer el servicio de tele-tecla.

**CONTESTACIÓN DE PRTC AL HECHO #22 PROPUESTO POR LA PARTE DEMANDANTE:**

Se admite que "debido a que una línea comercial, línea residencial y línea de teléfonos públicos, tienen la misma expectativa de uso, no hay diferencia en el costo de proveer el servicio de tele-tecla". […]

Sin embargo, el referido Exhibit X, Página 12, Contestación #44, no sustenta lo aseverado por los demandantes en torno al cobr[o] de "distintas tarifas a las clases demandantes" […]

**HECHO #23 PROPUESTO POR LA PARTE DEMANDANTE:**

23. PRTC cesó de facturar por el servicio de tele-tecla efectivo el 1 de diciembre de 2003, según alega, como producto de una decisión corporativa. Al requerírsele su producción, no pudo ofrecer ningún estudio de costo, cálculo o análisis para apoyar esa determinación.

**CONTESTACIÓN DE PRTC AL HECHO #23 PROPUESTO POR LA PARTE DEMANDANTE:**

Se admite que PRTC dejó de facturar un cargo aparte por el servicio de tele-tecla el 1 de diciembre del 2003. Se aclara que el cese de tal facturación fue resultado de un plan comprensivo acordado entre la Junta y PRTC el 7 de noviembre de 2003 en el caso Lambda Communications, Inc., v. Puerto Rico Telephone Company, Caso Núm. 97-Q-0003 consolidado con 97-Q-0001.

**HECHO #48 PROPUESTO POR LA PARTE DEMANDANTE:**

48. PRTC cobró a sus abonados de "estación principal residencial" la cuantía de 0.50¢ por el servicio de tele-tecla durante el periodo comprendido entre el 12 de septiembre de 1996 y el 30 de noviembre de 2003.

**HECHO #49 PROPUESTO POR LA PARTE DEMANDANTE:**

49. PRTC cobró a sus abonados de "estación principal de negocio" la cuantía de $2.50 por el servicio de tele-tecla durante el periodo comprendido entre el 12 de septiembre de 1996 y el 30 de noviembre de 2003.

**HECHO #50 PROPUESTO POR LA PARTE DEMANDANTE:**

50. PRTC cobró a sus abonados de "línea principal de negocio" la cuantía de $3.75 por el servicio de tele-tecla, durante el periodo comprendido entre el 12 de septiembre de 1996 y el 30 de noviembre de 2003.

**CONTESTACIÓN DE PRTC A LOS HECHOS #48, #49 Y #50 PROPUESTO POR LA PARTE DEMANDANTE:**

Se admiten.

El Tribunal Supremo ha determinado que la parte que se oponga a que se dicte sentencia sumaria, según la Regla 36.3 de Procedimiento Civil[78], deberá controvertir la prueba presentada por la parte que la solicita. Para ello, deberá cumplir con los mismos requisitos con los que tiene que cumplir el proponente, pero, además, su solicitud deberá contener:

[U]na relación concisa y organizada, con una referencia a los párrafos enumerados por la parte promovente, de los hechos esenciales y pertinentes que están realmente y de buena fe controvertidos, con indicación de los párrafos o las páginas de las declaraciones juradas u otra **prueba admisible en evidencia** donde se establecen los mismos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal[79]. (Énfasis nuestro).

---

[78] 32 LPRA Ap. V, R. 36.3.
[79] 32 LPRA Ap. V, R. 36.3(b)(2).

De la *Sentencia Parcial* apelada se desprende que el TPI entendió que la parte apelada demostró la inexistencia de controversias reales de hechos materiales. Acogió las cincuenta y tres (53) determinaciones de hechos incontrovertidos presentadas en la *Moción de Sentencia Sumaria.* Además, al emitir su dictamen, el TPI concluyó que:

> De conformidad con lo discutido durante la vista celebrada el 12 de septiembre de 2023, y los hechos que hemos determinado que no están en controversia, **el Tribunal considera innecesario escuchar el testimonio de los peritos**. El Tribunal concluye que, a la luz de las admisiones previas de la PRTC en el proceso ante la JRT, **no es necesario escuchar las opiniones periciales debido a que la función de los peritos es auxiliar al Tribunal y el Tribunal luego de analizar los dos informes periciales se tiene por satisfecho** y adopta aquellas partes sobre las cuales no existe controversia entre peritos. (Énfasis nuestro).

> Debido a lo aquí resuelto, se declara **NO HA LUGAR** el descubrimiento de prueba que ha solicitado PRTC mediante la "Moción Suplementaria en torno a la Necesidad de Llevar a cabo Descubrimiento de Prueba Plenario" y la "Moción para Compeler Descubrimiento de Prueba al Amparo de la Regla 34.2 de Procedimiento Civil", presentadas el 5 de octubre de 2023; así como la "Urgente Moción Solicitando que se Resuelva Solicitud de Descubrimiento de Prueba Plenario" y "Moción para Compeler" presentada por PRTC el 22 de noviembre de 2023. En ellas, PRTC pide retomar un descubrimiento de prueba que abandonó desde al menos el 2017.

> **Concluimos que PRTC no cumplió con la Regla 36.6 de las de Procedimiento Civil,** *supra,* **al no acreditar mediante declaración jurada qué descubrimiento de prueba en específico realmente necesita para oponerse a la moción de sentencia sumaria**. Su argumentación durante la vista a los efectos de que interesa realizar descubrimiento de prueba porque tal vez podrá proceder la descertificación de la clase es un ardid para dilatar aún más los procedimientos. Según lo resuelto en *García v. Enríquez* 153 DPR 323 (2001), el Tribunal debe tomar aquellas medidas que garanticen que no se recurra a la Regla 36.6, *supra,* como un ardid para demorar la solución final del asunto. Razón por la cual, era necesario que las razones que adujera PRTC en apoyo de su contención fueran razonables y adecuadas. Las razones que adujo PRTC durante la vista celebrada el 12 de septiembre de 2023 no cumplieron ese criterio.

> [...][80]

Al estar este Tribunal en la misma posición que el TPI al momento de adjudicar solicitudes de sentencia sumaria, es nuestra obligación indagar y examinar si en realidad existen controversias

---

[80] Véase, Apéndice del Recurso de Apelación, pág. 5112.

de hechos materiales. Dicho proceso de revisión nos lleva a examinar la *Moción de Sentencia Sumaria* y los documentos anejados a la misma, así como la *Oposición* a *Moción de Sentencia Sumaria* y sus anejos.

Del examen que precede surge que, aun cuando la parte apelada desglosa los hechos sobre los cuales aduce que no hay controversia en párrafos debidamente numerados y para cada uno de ellos especifica los anejos, **utiliza prueba inadmisible para sustentar su petitorio.** Este análisis también aplica a la *Oposición a Moción de Sentencia Sumaria*, la cual adolece de la misma condición que la *Moción de Sentencia Sumaria*, la utilización de prueba inadmisible.

Ante esta situación tan particular y anómala, en donde las partes utilizaron prueba inadmisible, colegimos que el TPI debió evaluar y determinar cuáles hechos no estaban en controversia y se sustentaran con prueba documental admisible. Primeramente, surge del análisis que la parte apelante admite algunos hechos de la *Moción de Sentencia Sumaria,* entre estos: el hecho cinco (5) y nueve (9). Los hechos del dieciocho al veintitrés (18 al 23), se admiten condicionalmente. En cuanto a los hechos cuarenta y ocho al cincuenta (48 al 50) la parte apelante los admite sin reserva. Además, el foro primario debió acoger los hechos esenciales y pertinentes propuestos por la parte apelante en la *Oposición a Moción de Sentencia Sumaria,* a saber: hecho diecisiete (17), hecho veinticuatro (24) y hecho veintiocho (28).

Ahora bien, procede examinar los señalamientos de error presentados por la parte apelante; y, adelantamos que con la adjudicación del primer, segundo y tercer error podemos disponer del recurso.

En el primer señalamiento de error, la parte apelante alega que incidió el TPI al acoger los hechos propuestos por la parte

apelada sin que los mismos establezcan la ilegalidad del cargo en cuestión y basar su dictamen en prueba inadmisible. En su segundo planteamiento de error, la parte apelante aduce que erró el TPI al aplicar las siguientes doctrinas jurídicas: impedimento colateral por sentencia, impedimento judicial, cobro de lo indebido y enriquecimiento injusto. Por último, en su tercer error señalado plantea que incidió el TPI al acoger la *Moción de Sentencia Sumaria* de manera prematura afectando así el debido proceso de ley al no permitir el descubrimiento de prueba según fue solicitado.

Por otro lado, la parte apelada sostiene que la ilegalidad del costo quedó establecida en las comunicaciones previas entre TPPR y la PRTC (admisiones ocurridas durante la tramitación del caso JRT-01-Q-0093), el informe pericial rendido por el perito Wood y las propias admisiones de la PRTC al contestar interrogatorios suministrados. A su vez, arguye que si hubo alguna una aplicación incorrecta por parte del TPI relacionada con las doctrinas judiciales esto no incide en el resultado de la Sentencia. Finalmente, sobre la presentación prematura de la *Moción de Sentencia Sumaria* aduce que la continuación del descubrimiento de prueba pospuesto perseguía descertificar la clase y demorar los procedimientos. Por tanto, entiende que el TPI aplicó correctamente la Regla 36 de las de Procedimiento Civil, *supra.*

Al abordar la discusión de los planteamientos de error presentados por la parte apelante, resulta meritorio comenzar discutiendo el tercer señalamiento de error. Particularmente, en el presente caso existe una controversia sobre si procede continuar con el descubrimiento de prueba previo, así como el descubrimiento de prueba pericial. No obstante, aun cuando el TPI accede a la continuación del descubrimiento de prueba pericial, sin haber vencido los términos del descubrimiento de prueba, dicta la *Sentencia Parcial* apelada.

Conforme a lo que reseñamos en el derecho que precede, referente la interpretación de la Regla 36.6 de Procedimiento Civil, *supra*, nuestro Tribunal Supremo ha sido enfático en que es preciso retrasar la disposición de una moción en solicitud de sentencia sumaria hasta que concluya el proceso de descubrimiento de prueba. Esto, con miras a que la parte promovida tenga la oportunidad de refutarla oportunamente y no se vea privada de su día en corte. Reiteramos lo expresado por nuestro Tribunal Supremo: "*confrontado el tribunal con una solicitud de sentencia sumaria prematura, [e]ste puede, en el ejercicio de su discreción, posponer la evaluación de la moción o denegarla en esa etapa de los procedimientos, amén de que el propósito de las reglas de procedimiento es hacer viable el que los tribunales hagan justicia al resolver las controversias*"[81]. Asimismo, se ha dispuesto que "la moción de sentencia sumaria es prematura porque el descubrimiento es inadecuado, está a medias o no se ha realizado"[82]. Por otro lado, el foro primario no está obligado a posponer o denegar dicha moción si cree que no es necesario, como ocurrió en este caso.

Es decir, si bien el TPI podía denegar o posponer la *Moción en Cumplimiento de Orden* del 1 de agosto de 2023 hasta tanto culminara el descubrimiento de prueba, también tenía la discreción para considerarla si entendía que se podía resolver con los documentos presentados en la moción y en el expediente judicial. Es importante puntualizar que, surge diáfanamente del expediente que desde el 2017 la parte apelante solicitó la continuación del descubrimiento de prueba previo[83], no como

---

[81] *García Rivera et al. v. Enríquez*, 153 DPR 323, 340 (2001).
[82] *Pérez v. El Vocero de PR*, 149 DPR 427, 449-450 (1999), *citando de Medina v. M.S. & D Química P.R., Inc.,* 135 DPR 716, 734 (1994).
[83] El 21 de julio de 2017, el TPI celebró conferencia sobre el estado de los procedimientos, la parte apelante **argumentó sobre la necesidad y continuidad del descubrimiento de prueba**, para así contestar la Sentencia Sumaria previamente presentada. El **TPI determinó que las partes debían contestar el**

expresa el TPI en su dictamen donde indica que "PRTC pide retomar un descubrimiento de prueba que abandonó desde al menos el 2017"[84]. Luego de posposiciones y retrasos fue entonces en el 2023 que el TPI, mediante una *Resolución,* **ordenó la celebración de vista argumentativa relativo a estos asuntos, celebrada la vista el foro primario expresó que resolvería por escrito**[85]. No obstante, el foro *a quo,* dictó la *Sentencia Parcial* apelada.

Tras estudiar detenidamente el legajo apelativo y examinar la transcripción de la prueba oral de la vista celebrada el 23 de septiembre de 2023, colegimos que la PRTC expuso ante el TPI una contención razonable y adecuada, para solicitar y sostener la necesidad de la culminación de un descubrimiento de prueba. Es decir, resulta esencial, previo a considerar cualquier adjudicación sumaria del caso ante su consideración, que el TPI permitiera que la PRTC completara el descubrimiento de prueba pendiente, el cual no va dirigido a la descertificación de clase[86].

Fíjese que, el 12 de septiembre de 2023, el TPI celebró vista argumentativa en la que determinó que "*[…] El Tribunal solamente está permitiendo la prueba pericial, descubrimiento de prueba pericial. En cuanto al otro descubrimiento de prueba... el*

---

**descubrimiento de prueba para el 8 de septiembre de 2017**. El 29 de mayo de 2019, notificada el 4 de junio de 2019, el TPI emitió *Orden* en la cual solicitó a las partes fechas hábiles para celebrar una conferencia sobre el estado de los procedimientos y, en lo pertinente, expresó: "*Finalmente, en la referida vista se considerará cualquier otro asunto pendiente en torno al descubrimiento de prueba.*" El 30 de junio de 2023, el TPI emitió y notificó el 7 de julio de 2023 una *Orden* en la cual, **solicitó que se aclarara la alegación de la parte apelante en cuanto a que la *Moción de Sentencia Sumaria* sometida por la parte apelada era prematura por no haber concluido el descubrimiento de prueba**. El 17 de julio de 2023, la parte apelada sometió *Moción en Cumplimiento de Orden* e informó en su párrafo segundo (2) que, *en cumplimiento con lo ordenado por el Tribunal, la parte compareciente no tiene objeción a que se deje en suspenso la Moción de Sentencia Sumaria y se proceda a deponer a los peritos de ambas partes.* Por otro lado, el de 1 de agosto de 2023, PRTC presentó *Moción en Cumplimiento de Orden* y expresó que ambas partes solicitaron la continuación del descubrimiento de prueba y desglosó lo adeudado por la parte apelada.

[84] Apéndice del Recurso de Apelación, pág. 5112.

[85] Véase TPO, vista 12 de septiembre de 2023, págs. 4311- 4316. La parte apelante, a través de la Lcda. Trelles, reitera la necesidad de completar el descubrimiento de prueba ante los cambios que han ocurrido a las clases, entre otra solicitudes de información requerida.

[86] No existe controversia de hecho que el 3 de mayo de 2005, el TPI emitió *Resolución* mediante la cual declaró *Ha Lugar* la certificación de las tres (3) clases demandantes.

*Tribunal va a emitir una determinación por escrito a la luz de la Moción de Sentencia Sumaria y la Oposición presentada*[87]. Así pues, antes del vencimiento del término que el TPI había concedido a las partes para que culminaran el descubrimiento de prueba pericial, y antes de emitir por escrito su decisión sobre la controversia al descubrimiento de prueba pendiente, el TPI dictó la *Sentencia Parcial* impugnada.

En conclusión, erró el foro primario al no aplazar la disposición sumaria del presente pleito hasta que las partes completaran un descubrimiento de prueba adecuado. El TPI incidió al aplicar incorrectamente el derecho vigente a la controversia de autos. La determinación del TPI sobre la Regla 36.6 de las de Procedimiento Civil, *supra,* no fue razonable. Por tanto, procede la culminación de ambos descubrimientos de prueba.

En cuanto al primer señalamiento de error presentado por la parte apelante, a juicio nuestro, la *Sentencia Parcial* dictada en este caso se fundamenta específicamente en el informe pericial del perito Wood y las presuntas admisiones realizadas por la PRTC en el caso JRT-01-Q-0093.

El TPI, al utilizar el informe del perito Wood, incide en la aplicación errónea de la Regla 36.6 de las de Procedimiento Civil, *supra*, y como resolvimos, el TPI tenía que permitir que finalizara el descubrimiento de prueba. El derecho a presentar prueba en apoyo de una reclamación constituye uno de los ejes centrales del debido proceso de ley[88].

Asimismo, diferimos de la siguiente conclusión emitida por el foro primario:

> De conformidad con lo discutido durante la vista celebrada el 12 de septiembre de 2023, y los hechos que hemos determinado que no están en controversia, **el Tribunal considera innecesario escuchar el testimonio de los peritos**. El Tribunal concluye que, a la luz de las admisiones

---

[87] Apéndice del Recurso de Apelación, pág. 4334.
[88] *Valentín v. Mun. de Añasco,* 145 DPR 887 (1998).

previas de la PRTC en el proceso ante la JRT, **no es necesario escuchar las opiniones periciales debido a que la función de los peritos es auxiliar al Tribunal y el Tribunal luego de analizar los dos informes periciales se tiene por satisfecho** y adopta aquellas partes sobre las cuales no existe controversia entre peritos. [...][89] (Énfasis nuestro).

En lo atinente a la prueba pericial, las Reglas 701 a la 709 de las Reglas de Evidencia de Puerto Rico de 2009[90], contemplan y regulan las opiniones y el testimonio pericial. A esos efectos, define perito como una persona quien, por su educación y experiencia, goza de un conocimiento o destreza sobre determinada materia, útil para formar una opinión que le sirva de ayuda al juzgador de los hechos[91]. El Tribunal Supremo ha determinado que, el perito testigo es aquel identificado como un testigo potencial, a quien se le puede requerir, entre otras cosas, divulgar la materia sobre la cual propone declarar, así como un resumen de sus opiniones y una breve expresión de las teorías, los hechos o los argumentos que sostienen las opiniones[92].

Así pues, el TPI contraviene el ordenamiento jurídico al utilizar los informes periciales sin terminar el descubrimiento de prueba pericial y, a su vez, determinar que era innecesario escuchar el testimonio de cada perito, sin haberse estipulado los testimonios periciales[93]. No cabe duda de que el error señalado por la parte apelante fue cometido por el TPI.

Respecto al segundo señalamiento de error, en la determinación de hechos incontrovertidos ocho (8) el TPI señala que:

> 8. PRTC tomó esa determinación por su cuenta y así lo informó a la JRT, sin haber suscrito acuerdo de desistimiento alguno con TPPR. *("PRTC recently communicated its decisions regarding the touchtone tariff charges to TPPR and has endeavored to obtain a formal settlement of this controversy. Despite the fact that no legal*

---

[89] Apéndice del Recurso de Apelación, pág. 5112.
[90] 32 LPRA Ap. VI.
[91] 32 LPRA Ap. VI, R. 702; *Rivera Gómez y otros v. Arcos Dorados Puerto Rico, Inc. y otros, supra.*
[92] *Mc Neil Healthcare LLC v. Municipio de Las Piedras*, 206 DPR 659 (2021).
[93] Por lo general, la admisibilidad de su testimonio goza de un amplio margen de liberalidad, claro está, **siempre que cumpla con los criterios propios a su cualificación y que quede establecido el valor probatorio de su declaración**. *Dye-Tex PR, Inc. v. Royal Ins. Co. PR,* 150 DPR 658 (2000).

*controversy remains between the parties, PRTC has been unable to obtain a formal settlement from TPPR*").[94]

El TPI considera que los documentos presentados en el proceso administrativo en el caso JRT-01-Q-0093 y previos al acuerdo transaccional son admisiones que pueden utilizarse en el caso de autos. Para sustentar sus conclusiones el foro primario aplicó las siguientes doctrinas jurídicas: impedimento colateral por sentencia en su modalidad ofensiva y la doctrina de impedimento judicial.

El Tribunal Supremo en el caso de *Carpets & Rugs v. Tropical Reps.*, 175 DPR 615, 631 (2009), citando a *U.S. Fire Insurance Co. v. AEE,* 174 DPR 846 (2008), analiza el contrato de transacción, *los requisitos para su validez el que exista una controversia entre las partes, que las partes posean la intención de sustituir la incertidumbre jurídica en la que se encuentran con la transacción y, por último, que existan mutuas concesiones entre las partes*[95].

Siendo así, las comunicaciones u ofertas a las que se refiere la Regla 408 de las de Evidencia de Puerto Rico de 2009[96] tienen necesariamente que referirse a aquellas que se realicen en el marco

---

[94] El TPI hace constar que en el Exhibit V de la *Moción de Sentencia Sumaria*, página 1, párrafo 3 y página 2, párrafo 1 - *Puerto Rico Telephone Company Inc.'s Motion to Dismiss and Motion for Stay*; véase, además, Exhibit XIII de la *Moción de Sentencia Sumaria-Contestación a Requerimiento #14* y #15 de las "Contestaciones y/u Objeciones a Requerimiento de Admisiones e Interrogatorio Especial", suscrita por PRTC, el 5 de junio de 2014.

[95] *Carpets & Rugs v. Tropical Reps, supra.*

[96] 32 LPRA Ap. VI, R. 408. Dicha Regla dispone como sigue:
(a) No es admisible para probar la validez o falta de validez de una reclamación, la cuantía reclamada o para impugnar a base de una declaración anterior inconsistente o por contradicción:
    (1) Evidencia de que una persona:
        (A) ha provisto, ofrecido o prometido proveer o
        (B) ha aceptado, ofrecido o prometido aceptar algo de valor, con el propósito de intentar o lograr transigir una reclamación cuando estaba en controversia su validez o la cuantía reclamada, o (2) Evidencia sobre conducta o declaraciones efectuadas durante gestiones dirigidas a transigir.
(b) Esta Regla no requiere la exclusión de evidencia que se ofrece para otros propósitos tales como impugnar por parcialidad o prejuicio a una persona testigo, refutar una alegación de demora indebida o probar un intento de obstruir una investigación o procedimiento criminal. Para fines de esta Regla, no se considerará como intento de obstruir una investigación o procedimiento criminal, la conducta dirigida a transigir un delito cuya transacción está autorizada por las Reglas de Procedimiento Criminal, el Código Penal o legislación especial.
(c) Esta Regla aplica en casos civiles y criminales.

de un proceso de negociación conducente al contrato de transacción. Por tanto, para que sean inadmisibles en evidencia, tiene que haber una controversia entre las partes al momento en que se realiza la oferta o comunicación en miras al contrato de transacción[97]. Igualmente, la comunicación u oferta debe hacerse dentro de un proceso en el cual la intención de las partes sea sustituir la incertidumbre jurídica de sus respectivas posiciones con la transacción[98].

A juicio nuestro, el TPI sopesó livianamente los requisitos establecidos por el Tribunal Supremo y optó por no aplicarlos al contrato de transacción otorgado en el 2002 entre TPPR y la PRTC. Tras evaluar el acuerdo transaccional surge que hubo una verdadera oferta y no meras posiciones o comunicaciones de negocio entre las partes[99]. La Regla 408 de las de Evidencia, *supra*, dispone que no será admisible prueba relacionada a las negociaciones u ofertas de transacción para propósito de proveer la validez de una reclamación o su cuantía. Relacionado a la mencionada Regla 408, el Tribunal Supremo expresó lo siguiente:

> [E]ste Tribunal está obligado a resolver los casos que hasta aquí lleguen conforme al Derecho aplicable, y no nos parece apropiado tomar en consideración -ni que se nos ponga en posición de considerar- las conversaciones y circunstancias de un acuerdo transaccional a la hora de disponer de las controversias, particularmente cuando nuestro ordenamiento no favorece su uso. [100]

Como corolario de lo anterior, es inevitable concluir que en la controversia ante nuestra consideración, las doctrinas jurídicas alegadas por la parte apelada se desvanecen al determinar que son

---

[97] C.B. Mueller, L.C. Kirpatrick, *Evidence*, Tercera Edición, New York, Aspen Publishers, 2003, sec. 4.25, pág. 243; J.B. Weinstein & M.A. Berger, *Weinstein's Federal Evidence*, (Joseph M. Mclaughlin ed.), Segunda Edición, New Jersey, Matthew Bender, 2008, Vol. 2, sec. 408.06, págs. 408-22; D.P. Leonard, *The New Wigmore: A Treatise on Evidence, Selected Rules of Limited Admissibility on Evidence*, New York, Aspen Law & Business, 2001, sec. 3.7.2, pág. 3:79.

[98] *Véase* Weinstein, *op. cit.*, sec. 408.03, pág. 408-11 ("What is controlling is the intention of the offeror as manifested by the form of the statement").

[99] Mueller & Kirpatrick, *op. cit. Véase también The New Wigmore, op. cit.*, sec. 3.7.2, pág. 3:7.4

[100] *Colón Rivera v. Wyeth Pharm.*, 184 DPR 184 (2012).

improcedentes las admisiones alegadas. Por lo tanto, no procede la interposición de las doctrinas de impedimento colateral por sentencia -ya sea en su vertiente ofensiva o defensiva-. Particularmente, la parte apelante (1) no ha tenido la oportunidad de litigar previamente el asunto y (2) no ha resultado ser la parte perdidosa en un litigio anterior[101]. Tampoco procede aplicar la doctrina de impedimento judicial o *judicial estoppel,* por existir una transacción en el caso JRT-01-Q-0093. En cuanto a las doctrinas de cobro de lo indebido y enriquecimiento injusto coincidimos con la parte apelante en cuanto a que dichas doctrinas no fueron articuladas en la Demanda presentada por la parte apelada.

En vista de lo anterior, resulta innecesaria la discusión del cuarto señalamiento de error.

Los foros apelativos, reconocemos y aceptamos como correctas las determinaciones de hechos de los tribunales de instancia. No obstante, los tribunales apelativos podemos descartar las determinaciones de hechos del TPI, cuando el juzgador actuó con pasión, prejuicio o parcialidad, o incurrió en error manifiesto. La deferencia cede cuando la totalidad de la evidencia analizada nos convence de que las conclusiones del TPI confligen con el balance más racional, justiciero y jurídico de toda la prueba recibida[102].

Por todo lo expuesto, resolvemos que el TPI erró al dictar *Sentencia Parcial,* por la vía sumaria, antes de concluir con el descubrimiento de prueba. Además, consideramos que el foro primario incide al considerar una transacción en el caso JRT-01-Q-0093 como prueba admisible.

---

[101] *P.R. Wire Prod. v. C. Crespo & Asoc., supra.*
[102] *Sucn. Rosado v. Acevedo Marrero,* 196 DPR 884, 917-918 (2016); *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 771 (2013); *Rivera Menéndez v. Action Service,* 185 DPR 431, 444 (2012).

**IV.**

Por los fundamentos antes expuestos, **revocamos** la *Sentencia Parcial* apelada y devolvemos el caso al Tribunal de Primera Instancia, Sala Superior de Bayamón, para la continuación de los procedimientos de conformidad con lo aquí expuesto.

Notifíquese.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


                          Lcda. Lilia M. Oquendo Solís
                       Secretaria del Tribunal de Apelaciones